**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DANIEL WHITE, by and through his next friends, )
Thomas and Sarah White; BRANDON BECERRA, )
by and through his next friends, Joseph and Mary )
Becerra; DAVID BRINKER, by and through his )
next friends, Timothy and Kathy Brinker; )
TIMOTHY DAVIS, by and through his next friend )
Freda Davis; IAN KENNEALLY, by and through )
his next friends, William and Patricia Kenneally; )     Case No. 16 C 9057
KATHERINE KLEIN, by and through her next )
friends, Raymond and Barbara Klein; CHERYL )     Judge
NEWING, by and through her next friend, Nita )
Newing; GWYNNE ROBERTS, by and through )
her next friends, Richard and Margaret Roberts; )
and CASSIE TOMARAS, by and through her next )
friend, Zoe Ann Tomaras, )
                                       )
                 Plaintiffs, )
                                       )
              v. )
                                         )
JAMES T. DIMAS, in his official capacity as )
Secretary of the Illinois Department of Human )
Services; and GREGORY FENTON, in his )
official capacity as Director of the Division of )
Developmental Disabilities, of the Illinois )
Department of Human Services, )
                                         )
                                         )
                Defendants. )

**COMPLAINT FOR EQUITABLE RELIEF**

Plaintiffs—Daniel White, by and through his next friends, Thomas and Sarah White;

Brandon Becerra, by and through his next friends, Joseph and Mary Becerra; David Brinker, by

and through his next friends, Timothy and Kathy Brinker; Timothy Davis, by and through his

next friend, Freda Davis; Katherine Klein, by and through her next friends, Raymond and

Barbara Klein; Ian Kenneally, by and through his next friends, William and Patricia Kenneally;

Cheryl Newing, by and through her next friend, Nita Newing; Gwynne Roberts, by and through

her next friends, Richard and Margaret Roberts, and Cassie Tomaras, by and through her next friend, Zoe Ann Tomaras (collectively, "plaintiffs")—by and through their attorneys, Morgan, Lewis & Bockius LLP, allege as follows:

## <u>INTRODUCTION</u>

1.     Plaintiffs are adults who each reside in one of the three STARS Family Services ("SFS") homes located in Wheaton, Illinois. Each plaintiff is a qualified individual with an intellectual or developmental disability, making him/her eligible to apply for the benefits and/or services of Illinois's "Home-Based Support Services Program for Adults with Mental Disabilities" (the "HBSS program" or "the Program"). The Program provides home and community-based services—often in the form of a monthly monetary payment to the parent as his/her adult child's Personal Support Worker, as permitted under the statutory scheme—to families in Illinois with adult children who meet the eligibility requirements of the Program.

2.     The HBSS program is authorized by § 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c), which permits a State to furnish payment for part or all of the cost of an array of home and community-based services (other than room and board) that assist Medicaid beneficiaries to live in the community and avoid institutionalization. Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, is commonly known as the "Medicaid Act."

3.     The Illinois Department of Human Services ("IDHS") is tasked with establishing the eligibility standards for the HBSS program, taking into consideration the disability levels of, and services for, the target population. Included in the eligibility standards for the HBSS program is a requirement that the adult with a qualifying disability must reside "full-time in his or her own home," 405 ILCS 80/2-5(d), as defined in the Developmental Disability and Mental Disability Services Act. *See* 405 ILCS 80/2-3(f). The HBSS program's express requirement that

2

the recipient reside "full-time in his or her own home" is not mandated by any federal statute or regulation. Nor is it consistent with the Americans with Disabilities Act of 1990 ("ADA") and the Rehabilitation Act of 1973's (the "Rehabilitation Act") integration mandate. Nor is the HBSS program interpreted literally by the IDHS to require recipients to live in their own homes; as set forth below, IDHS has considered group living arrangements to satisfy its home living requirement.

4.      Prior to April 2016, eight of the nine plaintiffs (i.e., Brandon Becerra, David Brinker, Timothy Davis, Ian Kenneally, Katherine Klein, Cheryl Newing, Cassie Tomaras, and Daniel White) received HBSS program benefits while residing in the SFS homes. Of those eight plaintiffs, seven were approved to receive HBSS program benefits prior to moving into the SFS homes. David Brinker was approved to receive HBSS program benefits after moving into the SFS homes.

5.      The ninth plaintiff (i.e., Gwynne Roberts) applied for HBSS program benefits in 2015, but defendants told her that the HBSS program benefits had been exhausted and, because she allegedly did not qualify for emergency funding, that she would have to apply again in 2016. When Gwynne Roberts applied for HBSS program benefits in 2016, defendants informed her that she was ineligible for the benefits due to her residency in the SFS homes.

6.      In April 2016, defendants (through the Division of Developmental Disabilities of IDHS) informed the parents of the eight plaintiffs previously approved to receive HBSS program benefits that they had determined the SFS homes did not meet their criteria for a qualifying residential setting under the Developmental Disability and Mental Disability Services Act. Defendants further informed the families that it would be unable to continue to fund the waiver benefits with plaintiffs residing in the SFS homes after June 30, 2016. The June 30, 2016

deadline was subsequently extended to October 15, 2016. On July 29, 2016, defendants again informed plaintiffs that they would terminate plaintiffs' HBSS program benefits on October 15, 2016, if plaintiffs continue to reside in the SFS homes because defendants do not believe the SFS homes comply with their requirements for the HBSS program's eligibility standards.

7.     With the October 15, 2016 deadline looming, in conjunction with defendants' refusal to reconsider their eligibility determination regarding the SFS homes, each of the nine plaintiffs and his/her families is facing undue, unnecessary, and irreparable hardship. Defendants' refusal to continue plaintiffs' waiver benefits if they continue residing at the SFS homes may, at the very least, force some plaintiffs to move out of the SFS homes and into their parents' homes. This move would confine plaintiffs to their respective homes, segregate plaintiffs from the community, and in turn severely impair or nullify each plaintiff's ability to succeed in small group living circumstances that integrates them into the Wheaton-area community and avoid institutionalization. Other plaintiffs would be forced into institutions, as their parents are elderly, living in retirement homes, and are unable to have their disabled children live with them. These results would be contrary to the purpose of the ADA's and the Rehabilitation Act's integration mandate, which requires States to provide services appropriate to the needs of qualified individuals with disabilities in a setting that enables such qualified individuals to interact with non-disabled persons to the fullest extent possible.

8.     In addition, given each plaintiff family's individual circumstances, including but not limited to plaintiffs' intellectual or developmental disabilities and their parents' advancing ages, financial status, physical/medical conditions, employment/retirement status, marital status, and ability to provide continuing support to plaintiffs, the revocation of waiver benefits poses correspondingly greater risks of irreparable harm, plaintiffs being confined to their

homes/segregated from their communities to their unquestionable detriment, and institutionalization.

9.      As of a result of this hardship, each of the plaintiffs faces a substantial risk of being confined to his/her home or institutionalized, and in either circumstance, of being segregated from his/her community, if his/her HBSS waiver benefits do not continue indefinitely after October 15, 2016.

## VENUE AND JURISDICTION

10.      This is an action for declaratory and injunctive relief brought pursuant to the ADA, 42 U.S.C. § 12101, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, and 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by federal law, state law, and the U.S. Constitution.

11.      Plaintiffs' claim for declaratory and injunctive relief is authorized by the ADA, the Rehabilitation Act, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-02, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.      This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331 because this case arises under the U.S. Constitution and laws of the United States.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to this cause of action occurred in the Northern District of Illinois.

## THE PARTIES

14.      Joseph and Mary Becerra live at 45 E. Wagner, Northlake, Illinois 60164. Their adult son, Brandon Becerra, resides at the SFS "Kenny Hansen, Jr. House ("Kenny House"), 375 N. Cross Street, Wheaton, Illinois 60187. Joseph Becerra's date of birth is June 22, 1951. Mary

Becerra's date of birth is January 26, 1965. Brandon Becerra's date of birth is September 12, 1984. Brandon Becerra has a developmental disability and severe anxiety.

15.     Timothy and Kathy Brinker live at 421 Hillside Avenue, Glen Ellyn, Illinois 60137. Their adult son, David Brinker, resides at the SFS "Washington House," 1414 N. Washington St., Wheaton, Illinois 60187. Timothy Brinker's date of birth is July 9, 1951. Kathy Brinker's date of birth is January 28, 1958. David Brinker's date of birth is February 22, 1984. David Brinker has Down syndrome and suffers from severe psychological issues, including kleptomania.

16.     Freda Davis lives at 134 Windsor Park Drive, Apt. D324, Carol Stream, Illinois 60188. Her adult son, Timothy Davis, resides at the Washington House, 1414 N. Washington Street, Wheaton, Illinois 60187. Freda Davis's date of birth is July 21, 1934. Timothy Davis's date of birth is April 21, 1976. Timothy Davis has Down syndrome.

17.     William and Patricia Kenneally live at 481 N. Silverleaf Blvd., Carol Stream, Illinois 60188. Their adult son, Ian Kenneally, resides at the Washington House, 1414 N. Washington Street, Wheaton, Illinois 60187. William Kenneally's date of birth is July 4, 1937. Patricia Kenneally's date of birth is January 31, 1938. Ian Kenneally's date of birth is December 13, 1981. Ian Kenneally has Down syndrome.

18.     Raymond and Barbara Klein live at 178 S. Ellyn Avenue, Glen Ellyn, Illinois 60137. Their adult daughter, Katherine Klein, resides at the SFS Jean Hooten Home ("Hooten Home"), 377 N. Cross Street, Wheaton, Illinois 60187. Raymond Klein's date of birth is February 8, 1949. Barbara Klein's date of birth is October 7, 1945. Katherine Klein's date of birth is July 30, 1980. Katherine Klein has Down syndrome and a significant depression disorder.

19.     Nita Newing lives at Windsor Park Drive, Apt. D312, Carol Stream, Illinois 60188. Her adult daughter, Cheryl Newing, resides at the Hooten Home, 377 N. Cross Street, Wheaton, Illinois 60187. Nita Newing date of birth is May 20, 1941. Cheryl Newing's date of birth is October 4, 1967. Cheryl Newing has Down syndrome.

20.     Richard and Margaret Roberts live at 141 N. Washington St., Wheaton, Illinois 60187. Their adult daughter, Gwynne Roberts, resides at the Hooten Home, 377 N. Cross Street, Wheaton, Illinois 60187. Richard Robert's date of birth is September 9, 1931. Margaret Robert's date of birth is April 6, 1940. Gwynne Robert's date of birth is October 17, 1966. Gwynne Roberts has Asperger's syndrome.

21.     Zoe Ann Tomaras lives at 543 Prince Edward Road, Glen Ellyn, Illinois 60137. Her daughter, Cassie Tomaras, resides at the Hooten Home, 377 N. Cross Street, Wheaton, Illinois 60187. Zoe Ann Tomaras's date of birth is November 26, 1955. Cassie Tomaras's date of birth is April 27, 1982. Cassie Tomaras has Down syndrome.

22.     Thomas and Sarah White live at 666 Turner Avenue, Glen Ellyn, Illinois 60137. They have an adult son, Daniel White, who resides at the Kenny House, 375 N. Cross St., Wheaton, Illinois, 60187. Thomas White's date of birth is December 9, 1948. Sarah White's date of birth is September 24, 1952. Daniel White's date of birth is January 2, 1986. Daniel White has a developmental disability and attention deficit disorder.

23.     Defendant James T. Dimas is the duly appointed Secretary of the Illinois Department of Human Services. He is sued in his official capacity.

24.     Defendant Gregory Fenton is the duly appointed Director of the Division of Developmental Disabilities of IDHS. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

I.  **SFS Provides Necessary And Beneficial Services to Plaintiffs And Similarly Situated Adults With Intellectual and Developmental Disabilities In A Home-Style Setting.**

25.    SFS is a nonprofit organization established in 2008 that is committed to helping families with adult children with intellectual and developmental disabilities.

26.    SFS provides small, supportive home-style living arrangements in Wheaton, Illinois. The SFS facilities provide adults with intellectual and developmental disabilities a living situation in which plaintiffs receive home and community-based services to meet their needs (with a few others having the similar developmental limitations), camaraderie, integration with non-developmentally impaired individuals including with respect to involvement in faith-based activities, as well as facilitate plaintiffs' participation in programs that encourage community integration and/or are designed to help these adults develop life skills for independent or semi-independent living. SFS currently operates three homes that provide such living arrangements.

27.    The goal of SFS, its programs, and its homes generally is to foster an environment where adults with intellectual and developmental disabilities can continue to live in the community and avoid institutionalization. To that end, the SFS homes are integrated in and support full access of individuals with intellectual or developmental disabilities to the greater community—including facilitating opportunities to seek employment and work in integrated settings, engage in community life, control personal resources, and receive services in the community—to the same or similar degree of access as individuals without intellectual or developmental disabilities.

28.    The Washington House was opened in 2011. It has five bedrooms and three bathrooms. Each of its four residents has his own bedroom; the fifth bedroom houses the SFS staff member who resides in the home (known as the resident "Community Builder").

29.     The Hooten Home was opened in 2015. It has six bedrooms on the main floor and four bathrooms. The second floor contains a two-bedroom, one-bathroom apartment with a separate kitchen for the Community Builder. The Hooten Home presently has four residents, plus the Community Builder who resides in the second floor apartment. One of the main floor bedrooms is occasionally used for guests. Another bedroom is presently unoccupied.

30.     The Kenny House opened in 2016. It has six bedrooms on the main floor and four bathrooms. The second floor contains a two-bedroom, one-bathroom apartment with a separate kitchen for the Community Builder. The Kenny House presently has five residents, plus the Community Builder who resides in the second floor apartment. One of the main floor bedrooms is occasionally used for guests.

31.     The SFS homes are not a nursing facility, an institution for mental diseases, an intermediate care facility for individuals with developmental disabilities ("IFC/ID"), or a hospital. The SFS homes are not publicly or privately operated facilities that provide inpatient institutional treatment, or in a building on the grounds of, or immediately adjacent to, a public institution. Rather, the SFS homes are located in residential communities in Wheaton, Illinois, with the goal and effect of integrating individuals with intellectual or developmental disabilities into the broader community.

32.     For zoning purposes, SFS homes are licensed as "Group Care Homes" pursuant to the Wheaton, Illinois Code of Ordinances ("Wheaton Code"). Sec. 26-167 of the Wheaton Code defines a "Group Care Home" as follows:

> (a) one residential dwelling maintained as a single housekeeping unit occupied by special needs individuals or (b) no more than two residential dwellings occupied by special needs individuals on the same zoning lot each being operated as a separate housekeeping unit but both being under the control and management of a single not-for-profit organization. In both instances no more than a total of 15 persons, including caregivers, shall occupy one residential dwelling or two

residential dwellings in combination with each other. The total number of occupants of a group care home may be further limited by the conditions of the special use permit where lawful. The occupants of a group care home are not required to meet the definition of a "family" as set forth in the zoning ordinance. Notwithstanding other provisions of this zoning ordinance, two dwellings on a single zoning lot shall not require 500 feet of separation. A group care home of two dwellings on a single zoning lot shall satisfy the bulk regulations, parking requirements, and other requirements and standards applicable to the zoning district and zoning lot as if the two dwellings were one. A group care home dwelling may have separate bath and kitchen facilities for live in staff. For purposes of this definition the term "special needs individuals" includes, but is not limited to, developmentally disabled persons, alcoholics, the mentally ill, or other persons participating in counseling, respite or rehabilitation programs. Group care homes shall provide a program structured to meet the social, rehabilitative, and respite needs of persons residing therein, in a residential community setting

33.     SFS has a valid license under the Wheaton Code to operate each of its three homes.

34.     The Wheaton Code requires SFS's licenses to be posted in a visible place on each SFS home. Other than that, the SFS homes lack any outer signage or markings indicating that they are a Group Care Home pursuant to the Wheaton Code or that they are owned by SFS. As such, the SFS homes have no distinguishable features, either on the outside or the inside, identifying residents as individuals with intellectual or developmental disabilities.

35.     Each of the three SFS homes is handicap accessible with wheelchair access.

36.     The Hooten Home and the Kenny House have 36" wide internal and external doors. The Hooten Home and the Kenny House have handicap equipment in the bathrooms and sprinkler systems throughout the house for fire protection. And the Hooten Home and the Kenny House have an elevator for travel between floors.

37.     Each SFS home resident, including plaintiffs, has his/her own bedroom. Each bedroom is lockable from the inside.

38.     A service agreement between SFS and an SFS home resident governs the terms of a given resident's occupancy of an SFS home.

39.     SFS home residents have the same responsibilities and protections from eviction that tenants have under the landlord/tenant laws of the State of Illinois, DuPage County, and/or Wheaton, Illinois.

40.     Each SFS home resident pays SFS a monthly service fee for the various services he/she receives at the SFS homes.

41.     The service agreement between SFS and each SFS home resident does not limit when SFS home residents may have visitors, or when SFS home residents may access the kitchen, prepare meals, or eat.

42.     SFS home residents have the ability to furnish or decorate their bedrooms as they choose.

43.     SFS home residents have the freedom and support to choose their own schedules and activities.

44.     Each of the plaintiffs views the SFS home he/she lives in as his home.

**II.     The IDHS Medicaid Program Includes The HBSS Program, Which Provides Home And Community-Based Services and Benefits to Medicaid-Eligible Adults.**

45.     Plaintiffs are qualified individuals with a disability within the meaning of the Medicaid Act, the Rehabilitation Act, and the ADA. Accordingly, plaintiffs are Medicaid-eligible adults who are entitled to receive medically necessary services under the Medicaid Act, 42 U.S.C. § 1396, *et seq*.

46.     Under 42 U.S.C. § 1396n, the U.S. Department of Health and Human services may waive certain requirements of the Medicaid program for states that provide payment for part or all of the cost of home and community-based services (other than room or board) to

11

individuals who, but for such services, would require the level of care provided in a hospital, nursing facility, or intermediate care facility for qualified individuals with disabilities. *See* 42 U.S.C. § 1396n(c). One of the purposes of these services is to facilitate qualified individuals with disabilities to live in a setting "in mainstream society" that enables them to remain as members of the community and "interact with non-disabled persons to the fullest extent possible," as required by the integration mandate. *See* 28 C.F.R. pt. 35, App. B.

47. The integration mandate provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see* 28 C.F.R. § 41.51(d). The federal regulations do not define the words "setting" or "home," or provide a limit on the number of unrelated residents who may live in a given residential setting for a state plan administering waiver benefits to be approved. Accordingly, the most integrated setting can include a shared living facility.

48. IDHS currently operates nine (9) such home and community-based Medicaid waiver programs. Each program has been approved by the U.S. Department of Health and Human Services pursuant to 42 U.S.C. § 1396n.

49. One such approved home and community-based Medicaid program in Illinois is the "Home-Based Support Services Program for Adults with Mental Disabilities" (the "HBSS program" or "the Program"). *See* 405 ILCS 80/2-4. The HBSS program was established by the "Home-Based Support Services Law for Adults with Mental Disabilities" (the "HBSS law"). *See* 405 ILCS 80/2-1.

50. The purpose of the HBSS law (and the HBSS program) "is to authorize the Department of Human Services to encourage, develop, sponsor, and fund home-based and

community-based services for adults with mental disabilities in order to provide alternatives to institutionalization and to permit adults with mental disabilities to remain in their own homes." 405 ILCS 80/2-2. Institutionalization occurs when an individual is segregated from the community, including when an individual is confined to his/her home or forced to live in an institutional facility.

51.     IDHS must "implement the purpose of the [HBSS program] by providing home-based services to adults with mental disabilities who need home-based services and who live in their own homes." 405 ILCS 80/2-4.

52.     The HBSS program is administered by the Division of Developmental Disabilities of IDHS.

53.     The HBSS program has certain eligibility requirements that an individual must satisfy in order to receive services under the Program. To be eligible to participate in the HBSS program, the individual must provide IDHS with the following:

(a) A statement that the adult with a mental disability resides in the State of Illinois and is over the age of 18 years.

(b) Verification that the adult with a mental disability has one of the following conditions: severe autism, severe mental illness, a severe or profound intellectual disability, or severe and multiple impairments.

(c) Verification that the adult with a mental disability has applied and is eligible for federal Supplemental Security Income or federal Social Security Disability Income benefits.

(d) Verification that the adult with a mental disability resides full-time in his or her own home or that, within 2 months of receipt of services under [the HBSS law], he or she will reside full-time in his or her own home.

405 ILCS 80/2-5. Notwithstanding the HBSS law's arbitrary and capricious definition of "in his or her home," *see infra* ¶ 56, 405 ILCS 80/2-3(f), plaintiffs satisfy these requirements.

54.    "Adult with a mental disability" is defined under the HBSS law as follows:

[A] person over the age of 18 years who lives in his or her own home; who needs home-based services, but does not require 24-hour-a-day supervision; and who has one of the following conditions: severe autism, severe mental illness, a severe or profound intellectual disability, or severe and multiple impairments.

405 ILCS 80/2-3(e). Plaintiffs satisfy these requirements.

55.    "Home-based services" under the HBSS law means "services provided to an adult with a mental disability in his or her own home. These services include but are not limited to:

(1) home health services;
(2) case management;
(3) crisis management;
(4) training and assistance in self-care;
(5) personal care services;
(6) habilitation and rehabilitation services;
(7) employment-related services;
(8) respite care; and
(9) other skill training that enables a person to become self-supporting."

405 ILCS 80/2-3(c). The services provided to plaintiffs, either through their personal support workers or other individuals, satisfy this requirement.

56.    "In one's 'own home'" under the HBSS law:

means that an adult with a mental disability lives alone; or that an adult with a mental disability is in full-time residence with his or her parents, legal guardian, or other relatives; *or that an adult with a mental disability is in full-time residence* in a setting not subject to licensure under the Nursing Home Care Act, the Specialized Mental Health Rehabilitation Act of 2013, the ID/DD Community Care Act, or the Child Care Act of 1969, as now or hereafter amended, *with 3 or fewer adults unrelated to the adult with a mental disability who do not provide home-based services to the adult with a mental disability.*

405 ILCS 80/2-3(f) (emphasis added). The SFS living circumstances satisfy these requirements in every material respect. However, IDHS contends they are not satisfied because the SFS homes have residents living with more than three unrelated adults who do not provide home-based

14

services. IDHS's position is contrary to the integration mandate, which focuses on providing services in the most integrated setting, not the number of unrelated residents in a given home.

57.    The HBSS law states that services provided by IDHS under the HBSS program "shall be denied:

> (a) if the adult with a mental disability no longer meets the eligibility criteria,
>
> (b) if the adult with a mental disability submits false information in an application or reapplication for participation in the [HBSS program], or
>
> (c) if the adult with a mental disability fails to request or access any services after 120 days. . . . ."

405 ILCS 80/2-8.

58.    If IDHS denies services under the HBSS program for any of the reasons articulated in 405 ILCS 80/2-8(a)-(c), IDHS "shall give written notice of the decision and the reasons for denial of services to the person who signed the application. Such notice shall contain information on requesting an appeal under [405 ILCS 80/2-13]." 405 ILCS 80/2-8.

59.    The HBSS law sets forth the appeal process in the event IDHS denies an application for participation in the HBSS program or denies services for any of the reasons described in 405 ILCS 80/2-8(a)-(c). *See* 405 ILCS 80/2-13. The HBSS law provides as follows:

> If the [IDHS] denies an application for participation in the [HBSS program] or denies services as provided in [405 ILCS 80/2-8(a)-(c)), [IDHS] shall give written notice of the denial to the person who signed the application. The person who signed the application may appeal [IDHS's] denial within 20 days after receipt of [IDHS's] written notice by mailing a written appeal request to [IDHS]. [IDHS's] denial of an appeal shall constitute a final administrative decision. Final administrative decisions shall be subject to judicial review exclusively as provided in the Administrative Review Law, as now or hereafter amended, except that any petition for judicial review of a final administrative decision by the [IDHS] under [the HBSS law] shall be filed within 30 days after receipt of notice of the [IDHS's] final administrative decision. The term 'administrative decision' has the meaning ascribed to it in Section 3-101 of the Code of Civil Procedure, as now or hereafter amended.

*Id.*

60. The appeal process set forth in 405 ILCS 80/2-13 is mandated by the Medicaid Act, which provides, in part, that "[a] state plan for medical assistance must . . . (3) provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness[.]" 42 U.S.C. § 1396a(a)(3).

### III. Eight Of The Nine Plaintiffs Have Received HBSS Program Benefits While Living In the SFS Homes.

61. Brandon Becerra has been approved to receive HBSS program benefits since March 2007. In February 2016, Brandon moved into the Kenny House in Wheaton, Illinois. He and his parents, Joseph and Mary Becerra, have continued to receive HBSS program since Brandon moved into the Kenny House. On information and belief, defendants were aware that the Becerra family continued to receive HBSS program benefits after Brandon moved into the Kenny House.

62. In July 2011, David Brinker moved into the Washington House in Wheaton, Illinois. He and his parents, Timothy and Kathy Brinker, were approved to receive HBSS program benefits in December 2012. David Brinker and his parents have continued to receive HBSS program benefits since they were approved to receive the benefits. On information and belief, defendants were aware that the Brinker family continued to receive HBSS program benefits after David moved into the Washington House.

63. Timothy Davis has been approved to receive HBSS program benefits since May 2011. In July 2011, Timothy moved into the Washington House in Wheaton, Illinois. He and his mother, Freda Davis, have continued to receive HBSS program benefits since Timothy moved into the Washington House. On information and belief, defendants were aware that the Davis

16

family continued to receive HBSS program benefits after Timothy moved into the Washington House.

64.     Ian Kenneally has been approved to receive HBSS program benefits since July 2008. In December 2012, Ian moved into the Washington House in Wheaton, Illinois. He and his parents, William and Patricia Kenneally, have continued to receive HBSS program benefits since Ian moved into the Kenny House. On information and belief, defendants were aware that the Kenneally family continued to receive HBSS program benefits after Ian moved into the Washington House.

65.     Katherine Klein has been approved to receive HBSS program benefits since June 2008. In April 2015, Katherine moved into the Hooten Home in Wheaton, Illinois. She and her parents, Raymond and Barbara Klein, have continued to receive HBSS program benefits since Katherine moved into the Hooten Home. On information and belief, defendants were aware that the Klein family continued to receive HBSS program benefits after Katherine moved into the Hooten Home.

66.     Cheryl Newing has been approved to receive HBSS program benefits since January 2006. In April 2015, Cheryl moved into the Hooten Home in Wheaton, Illinois. She and her mother, Nita Newing, have continued to receive HBSS program benefits since Cheryl moved into the Hooten Home. On information and belief, defendants were aware that the Newing family continued to receive HBSS program benefits after Cheryl moved into the Hooten Home.

67.     Cassie Tomaras has been approved to receive HBSS program benefits since July 2008. In April 2015, Cassie moved into the Hooten Home in Wheaton, Illinois. She and her mother, Zoe Ann Tomaras, have continued to receive HBSS program benefits since Cassie moved into the Hooten Home. On information and belief, defendants were aware that the

Tomaras family continued to receive HBSS program benefits after Cassie moved into the Hooten Home.

68.     Daniel White has been approved to receive HBSS program benefits since July 2008. In February 2016, Daniel White moved into the Kenny House in Wheaton, Illinois. He and his parents, Thomas and Sarah White, have continued to receive HBSS program benefits after Daniel moved into the Kenny House. On information and belief, defendants were aware that the White family continued to receive HBSS program benefits after Daniel moved into the Kenny House.

69.     In April 2015, Gwynne Roberts, moved into the Hooten Home in Wheaton, Illinois. Gwynne and her parents, Richard and Margaret Roberts, applied for HBSS program benefits in 2015 after Gwynne moved into the Hooten Home, but defendants denied their request. Gwynne and her parents filed a new application in 2016, but defendants again denied their request, specifically citing Gwynne's residence in the Hooten Home as the basis for the denial of the application.

70.     Of the eight families who have received HBSS program benefits since their adult children moved into the SFS homes (i.e., the Becerra, Brinker, Davis, Kenneally, Klein, Newing, Tomaras, and White families), some of the parents use the waiver benefits to pay themselves as personal support workers for the services they directly provide to their adult children. Other parents use the waiver benefits to pay for services provided by others, such as those services listed in 405 ILCS 80/2-3(c). Because HBSS program benefits pay for services necessary for plaintiffs to remain in the community, the parents are able to use their other resources for things like the SFS homes' monthly service fee, which in turn allows plaintiffs to reside in one of the

SFS homes and receive, among other benefits, services through the SFS "Life Skills Tutors" who visit the SFS homes during the day.

**IV.  Defendants Belatedly And Unreasonably Determined That The SFS Homes Do Not Satisfy The Residency Requirement For Plaintiffs' Parents To Receive HBSS Program Benefits.**

71.     Gwynne Roberts and her parents applied for HBSS program benefits in 2015, but defendants informed them that the HBSS program benefits had been exhausted and, because Gwynne allegedly did not qualify for emergency funding, that she would not receive any HBSS program benefits in 2015. Gwynne Roberts and her parents applied for HBSS program benefits again in 2016, but IDHS informed her that she was ineligible for the benefits due to her residency in the SFS homes.

72.     In a letter dated April 15, 2016, from defendant Fenton to Sarah White, mother of Daniel White, defendant stated that the Division of Developmental Disabilities determined that the SFS homes do not meet the criteria established under the regulations and policies for an individual to be eligible for HBSS program benefits. *See* IDHS letter to S. White (dated April 15, 2016), attached as Exhibit 1.

73.     The April 15, 2016 letter to Ms. White provided, in part, as follows:

> The Division has determined that the homes operated by STARS Family Services do not meet these criteria because the homes are licensed by the City of Wheaton as a Group Care Home. The license allows occupancy capacity at a level that exceeds the standards prescribed in the Developmental Disability and Mental Disability Services Act. In addition, the requirement that individuals be absent from their home during certain hours of the day is not viewed as supporting participant directed opportunities under the waiver requirements.

*Id.*

74.     The April 15, 2016 letter to Ms. White further provided that as a result of defendants' determination that the SFS homes do not satisfy the residential setting eligibility

requirements, defendants would no longer continue to fund or provide HBSS program benefits in the SFS setting after June 30, 2016, and that in the event Ms. White or her family decided to continue to receive home and community-based services in the SFS setting, those benefits would be discontinued after June 30, 2016. *See id.*

75.     The April 15, 2016 letter to Ms. White did not inform the White family that they could appeal defendants' decision, or provide any details on the manner in which the White family could do so. Rather, the letter stated, "Departmental administrative rule does not provide a right to appeal this decision." *See id.*

76.     The Becerra, Brinker, Davis, Kenneally, Klein, Newing, and Tomaras families each received a letter from defendant Fenton in substantial form and substance as the April 15, 2016 letter to Ms. White. These letters also informed the families that defendants would no longer continue to provide HBSS program benefits in the SFS home setting after June 30, 2016.

77.     On May 25, 2016, David Bea, an attorney for SFS, had a meeting in Springfield, Illinois, with members of IDHS to discuss defendant Fenton's letters to plaintiffs and defendants' statement that they would no longer provide HBSS program benefits in the SFS setting after June 30, 2016. The meeting was organized by Brian Colgan, Chief of Staff to Lieutenant Governor Evelyn Santuinetti.

78.     In a letter dated May 26, 2016, to Ms. White from Troy Markert, Program Manager, Division of Developmental Disabilities, defendants stated that "the Division is approving a 6 month extension from the date on your original notification letter. . . . This extension will remain effective through 10/15/16." *See* IDHS letter to S. White (dated May 26, 2016), attached as Exhibit 2.

79.     The Becerra, Brinker, Davis, Kenneally, Klein, Newing, and Tomaras families each received a letter in substantial form and substance as the May 26, 2016 letter to Ms. White.

80.     Defendants represented that they will continue to provide HBSS program benefits to all plaintiffs currently receiving the benefits in the SFS homes until October 15, 2016, after which time, defendants will terminate those benefits.

81.     On June 3, 2016, Mr. Bea sent a letter on behalf of SFS to Reta Hoskin, Associate Director of the Division of Developmental Disabilities. *See* D. Bea letter to R. Hoskin (dated June 3, 2016), attached as Exhibit 3. The purpose of the letter was to recap the major discussion points of the May 25, 2016 meeting, establish that the SFS homes clearly accomplish the objectives and goals of the state and federal laws creating the waiver services and for community integration, and document how the individuals resolved certain objections defendants had regarding their ability to continue providing HBSS program benefits to the families with adult children residing in the SFS homes, including plaintiffs.

82.     On July 28, 2016, plaintiffs' counsel sent a letter on plaintiffs' behalf to Ms. Hoskin, informing her that the families are in agreement with, and hereby join, Mr. Bea's letter dated June 3, 2016. *See* C. Jackson letter to R. Hoskin (dated July 28, 2016), attached as Exhibit 4.

83.     On July 29, 2016, Patricia M. Browne, Deputy General Counsel for IDHS, sent a letter to Mr. Bea. *See* P. Browne letter to D. Bea (dated July 29, 2016), attached as Exhibit 5. The letter stated, among other things, that "IDHS does not believe the SFS settings comply with the requirements for Home-Based Services" but that "IDHS will continue to provide funding for individual's services until October 15, 2016, according to the terms listed in the notices of termination sent to families."

84.     The July 29, 2016 letter from Ms. Browne included six different bullet points of "factors" behind defendants' decision. The first factor is that "[s]ome of the homes have residents living with more than three unrelated adults." The other five factors in the letter are not listed or set forth anywhere in the Illinois statute describing the HBSS program's purpose, goals, or eligibility requirements. Those five factors are:

a.  [SFS] has live-in staff in the home. [SFS], not the residents, is responsible for hiring and firing staff.

b.  Families pay fees to [SFS].

c.  The homes are currently licensed by the local village. An individual's private home would not typically require a local license.

d.  There are concerns with medication oversight in these settings. It appears the individuals cannot administer and manage their own medications; nor does it appear to us that family members are completely handling this matter. It is problematic if the [SFS] staff are involved with medications to any extent, including storage, prompts, etc.

e.  It is assumed that residents typically leave the homes from 10 a.m. to 2 p.m. daily. This would not be the case if the individual controlled the home.

These reasons for denying HBSS program benefits to plaintiffs contravene the overall purpose of waiver benefits (i.e., to allow qualified individuals with disabilities to interact with disabled and non-disabled persons in the community alike) and the integration mandate, which requires services to be provided in the most integrated setting. *See* 28 C.F.R. pt. 35, App. B.; *see also* 28 C.F.R. § 35.130(d); 28 C.F.R. § 41.51(d); U.S. Dep't of Justice, *Statement of the Department of Justice on the Integration Mandate of Title II of the ADA and Olmstead v. L.C.* (June 22, 2011), attached as Exhibit 6.

85.     Ms. Browne's July 29, 2016 letter stated that Mr. Bea's June 3, 2016 letter "does present some relevant policy reasons for allowing individuals residing at [SFS homes] to receive funding through the Home-Based Services program."

22

**V.    Plaintiffs Are At A Substantial Risk Of Segregation From The Community And/Or Institutionalization If Defendants Follows Through With Their Threat To Cut Off Plaintiffs' HBSS Program Benefits.**

86.    The SFS homes are an innovative idea that is ideal for needs of adults with intellectual or developmental disabilities who do not require residence in a hospital or other similar institutional-like setting but are unable to live alone.

87.    The SFS homes provide an opportunity for its residents to receive daily interaction with non-disabled individuals through the SFS programs. In addition, the SFS homes and programs allow the parents of plaintiffs to devise a long-term plan for the residency of plaintiffs, accounting for factors such as the parents' ages, health, lack or diminution of financial resources, or lack of other family members.

88.    Plaintiffs Brandon Becerra, David Brinker, Timothy Davis, Ian Kenneally, Katherine Klein, Cheryl Newing, Cassie Tomaras, and Daniel White, and their parents, each receive between $1,000 to $2,000 per month in HBSS program benefits—or less than $25,000 annually.

89.    The average annual cost of a state-run institution in the United States in 2009 was $196,735 per person. In Illinois, the average was $144,175 per person. *See* National Council on Disability, Deinstitutionalization Toolkit: COSTS – in DETAIL (issued January 28, 2012), attached as Exhibit 7, *available at* http://www.ncd.gov/publications/2012/DITo olkit/Costs/inDetail/.

90.    It is thus significantly less expensive for the State of Illinois and defendants to continue providing HBSS program benefits to plaintiffs while they reside at the SFS homes than it would be for the State and defendants to fund plaintiffs' placement at a state-run institution.

91.     On information and belief, there are no alternative funding arrangements for plaintiffs, or available benefits for plaintiffs to receive, under federal or Illinois state law that could replace the HBSS program benefits that plaintiffs and their parents currently receive if plaintiffs continue to reside in the SFS homes (or in the case of Gwynne Roberts, for which she has applied) after October 15, 2016.

92.     On information and belief, Illinois's Community Integrated Living Arrangement ("CILA") facilities, or other similar State-licensed shared living facilities for individuals with intellectual or developmental disabilities, have very little capacity to hold new residents. And there are no CILA or any other similar State-licensed shared living facilities near Wheaton, Illinois, with availability to hold plaintiffs.

93.     There are no adequate alternative housing arrangements for plaintiffs to remain as integrated, active members of their community in the event they are forced to leave the SFS homes due to defendants' HBSS program eligibility determinations.

94.     On information and belief, plaintiffs will be put back on the Prioritization of Urgency of Need for Services ("PUNS") list if there is a gap in their HBSS program eligibility. Accordingly, if plaintiffs are denied HBSS program benefits for any period of time, it is unknown as to whether or when plaintiffs would be able to receive HBSS program benefits again.

95.     The parents of plaintiffs have personal circumstances, including but not limited to their ages, financial status, physical/medical conditions, employment/retirement status, marital status, and ability to provide continuing support to plaintiffs, which would make the loss of HBSS programs benefits an extreme burden for the plaintiff's parents to bear and could cause drastic, long-lasting effects on the lives of plaintiffs and their families. At the very least,

plaintiffs' families would need to use their retirement resources to make up for any loss of HBSS program benefits.

96.     If defendants cut off plaintiffs' HBSS program benefits (or continue to deny Gwynne Robert's request for benefits) due to plaintiffs' residence in the SFS homes, there is a substantial risk that plaintiffs and their families will be unable to afford the services and programs that plaintiffs currently receive as residents of the SFS homes and that plaintiffs will, in turn, be confined to their homes (wherever they may be) and/or segregated from the community. This will likely cause a decline in plaintiffs' health and welfare such that they may need to be placed in an institution.

97.     If defendants cut off plaintiffs' HBSS program benefits  (or continue to deny Gwynne Robert's request for benefits) due to plaintiffs' residence in the SFS homes, plaintiffs will be at grave risk of immediate harm in the community and at a substantial risk for placement in a state-run institution. Indeed, there is a substantial risk that defendants' decision to cut off plaintiffs' benefits will cause a decline in plaintiffs' health and welfare such that they may eventually need to be placed in an institution.

98.     Due to plaintiffs' intellectual or developmental disabilities and their families' personal circumstances, including but not limited to their parents' ages, financial resources, and current residences, some of plaintiffs' parents may be required to immediately consider their children's placement in an institutional setting should their HBSS program funding cease on October 15, 2016.

99.     Plaintiffs regard the SFS homes as their homes. Plaintiffs would be extremely upset if they were forced to leave the SFS homes as a result of defendants' decision to terminate their HBSS program benefits. Plaintiffs would likewise be upset if their housemates were forced

25

to leave the SFS homes. Forcing plaintiffs to leave the SFS homes would also lead to significant adverse effects regarding the health and emotional well-being of plaintiffs, as well as any other plaintiffs or SFS home residents who may continue residing in the SFS homes for an additional period of time.

100. Defendants' decision to discontinue HBSS waiver benefits to plaintiffs (or to continue denying Gwynne Robert's request for benefits) due to plaintiffs' residence in the SFS homes violates the ADA's and the Rehabilitation Act's integration mandate.

<u>**COUNT I**</u>
<u>**Violation of the ADA (Alleged By All Plaintiffs)**</u>

101. Plaintiffs repeat and reallege the allegations in paragraphs 1 to 100 of their Complaint as though fully set forth herein.

102. Title II of the ADA prohibits public entities from discriminating against or excluding a qualified individual with a disability from participating in the benefits of services, programs, or activities of the public entity on the basis of disability. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

103. The ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d).

104. An integrated setting is one that allows qualified individuals with disabilities to live in their home or a "home-like" setting with family supports and the opportunity to participate in their communities, and that "enables [them] to interact with nondisabled person to the fullest extent possible." *See* 28 C.F.R. pt. 35, App. B.

105. Public entities must also make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public

26

entity can demonstrate that the modifications would fundamentally alter the nature of the service, program, or activity. *See* 28 C.F.R. § 35.130(b)(7).

106.     Plaintiffs are qualified individuals with a disability within the meaning of Title II of the ADA.

107.     IDHS, of which defendant Dimas is the Secretary, is a "public entity" within the meaning of Title II of the ADA.

108.     The Division of Developmental Disabilities of IDHS, of which defendant Fenton is the Director, is a "public entity" within the meaning of the ADA.

109.     Policies and practices that have the effects of unjustifiably segregating persons with disabilities in their homes or in institutions constitute prohibited discrimination under the ADA.

110.     The HBSS program's requirement that the qualified individual with a disability's home have "3 or fewer other unrelated to the adult with a mental disability who not provide home-based services to the adult with a mental disability," 405 ILCS 80/2-3(f), is arbitrary, capricious, and contrary to the purpose and direction of the ADA's integration mandate. Similarly, IDHS's reliance on factors that are not listed or set forth anywhere in the Illinois statute describing the HBSS program's purpose, goals, or eligibility requirements, or the federal regulations permitting home and community-based waiver benefits, is improper, arbitrary, and contrary to the purpose of  ADA's integration mandate.

111.     By unilaterally denying plaintiffs' requests for HBSS program benefits while they are residents of the SFS homes and/or in creating residential eligibility requirements for the HBSS program that the SFS homes do not satisfy, defendants have violated the "integration mandate" of the ADA and thus improperly discriminated against plaintiffs.

27

112.    By threatening to withhold adequate home and community-based mental health/behavioral benefits and services previously provided to plaintiffs (or denying Gwynne Robert's request for benefits), defendants are discriminating against plaintiffs by seeking to segregate them in their homes or in institutions in violation of the ADA.

113.    Providing plaintiffs with HBSS program benefits while they reside at the SFS homes would not result in a fundamental alteration of the HBSS program, including its eligibility requirements, or any other Illinois state home and community-based Medicaid waiver program. Nor would it result in an undue burden on IDHS; any of its Divisions, including the Division of Developmental Disabilities; or the State of Illinois.

114.    The harm to plaintiffs is the result of defendants' refusal to provide services to plaintiffs in the most integrated setting appropriate and contrary to the rights of plaintiffs, which are secured by the ADA.

115.    The harm to plaintiffs is the result of defendants' intentional conduct and/or deliberate indifference to the rights of plaintiffs.

116.    In deciding to cease providing plaintiffs with HBSS program benefits (or denying Gwynne Robert's request for benefits), defendants have, at all times, acted or refused to act under color of state law.

## COUNT II
## Violation of the Rehabilitation Act (Alleged By All Plaintiffs)

117.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 100 of their Complaint as though fully set forth herein.

118.    The Rehabilitation Act, 29 U.S.C. § 794, prohibits public entities and recipients of federal benefits from discriminating against any individual by reason of disability.

119.    The implementing regulations for the Rehabilitation Act require that public and federally funded entities provide programs and activities "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

120.    An integrated setting is one that allows qualified individuals with disabilities to live in their home or a "home-like" setting with family supports and the opportunity to participate in their communities, and that "enables [them] to interact with nondisabled person to the fullest extent possible." *See* 28 C.F.R. pt. 35, App. B.;

121.    IDHS, and in turn, its Division of Developmental Disabilities, is a recipient of federal funds under the Rehabilitation Act.

122.    Plaintiffs are qualified individuals with a disability within the meaning of the Rehabilitation Act.

123.    Policies and practices that have the effects of unjustifiably segregating persons with disabilities in their homes or in institutions constitute prohibited discrimination under the Rehabilitation Act.

124.    The HBSS program's requirement that the qualified individual with a disability's home have "3 or fewer other unrelated to the adult with a mental disability who not provide home-based services to the adult with a mental disability," 405 ILCS 80/2-3(f), is arbitrary and contrary to the purpose and direction of the Rehabilitation Act's integration mandate. Similarly, defendants' reliance on factors that are not listed or set forth anywhere in the Illinois statute describing the HBSS program's purpose, goals, or eligibility requirements, or the federal regulations permitting home and community-based waiver benefits, is improper, arbitrary, and contrary to the purpose of Rehabilitation Act's integration mandate.

125.    By unilaterally denying plaintiffs' requests for HBSS program benefits while they are residents of the SFS homes and/or in creating residential eligibility requirements for the HBSS program that the SFS homes do not satisfy, defendants have violated the "integration mandate" of the Rehabilitation Act and thus improperly discriminated against plaintiffs.

126.    By threatening to withhold adequate home and community-based mental health/behavioral benefits or services previously provided to plaintiffs (or denying Gwynne Robert's request for benefits), defendants are discriminating against plaintiffs by seeking to segregate them in their own homes or in institutions in violation of the Rehabilitation Act.

127.    Providing plaintiffs and their parents with HBSS program benefits while plaintiffs are residents of the SFS homes would not result in a fundamental alteration of the HBSS program, including its eligibility requirements or any other Illinois home and community-based Medicaid waiver program. Nor would it result in an undue burden on IDHS, any of its Divisions (including the Division of Developmental Disabilities), or the State of Illinois.

128.    The harm to plaintiffs is the result of defendants' refusal to provide services to plaintiffs in the most integrated setting appropriate and contrary to the rights of plaintiffs, which are secured by the Rehabilitation Act.

129.    The harm to plaintiffs is the result of defendants' intentional conduct and/or deliberate indifference to the rights of plaintiffs.

130.    In deciding to cease providing plaintiffs and their parents with HBSS program benefits (or denying Gwynne Robert's request for benefits), defendants have, at all times, acted or refused to act under color of state law.

## COUNT III
### Violation of the Medicaid Act (Alleged By All Except Plaintiff Roberts)

131.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 100 of their Complaint as though fully set forth herein.

132.    The Medicaid Act provides, in part, that "[a] state plan for medical assistance must . . . (3) provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness[.]" 42 U.S.C. § 1396a(a)(3).

133.    By unilaterally denying plaintiffs' request to continue receiving HBSS program benefits while they reside at the SFS homes and, in turn, failing to provide proper notice and/or a hearing to challenge the denial, defendants have violated 42 U.S.C. § 1396a(a)(3).

134.    The harm to plaintiffs is the result of defendants' intentional conduct and/or deliberate indifference to the rights of plaintiffs, which are secured by the Medicaid Act.

135.    In deciding to cease providing plaintiffs with HBSS program benefits, defendants have, at all times, acted or refused to act under color of state law.

## COUNT IV
### Violation of the Due Process Clause (Alleged By All Except Plaintiff Roberts)

136.    Plaintiffs repeat and reallege the allegations in paragraphs 1 to 100 of their Complaint as though fully set forth herein.

137.    The Due Process Clause of the Fifth and Fourteenth Amendments prohibits deprivation of life, liberty, and property without due process of law.

138.    Eight of the nine plaintiffs (i.e., Becerra, Brinker, Davis, Klein, Kenneally, Newing, Tomaras, and White) have a cognizable liberty interest in the HBSS program benefits they were approved to receive and have been receiving as residents of the SFS homes.

139.    By unilaterally denying plaintiffs' request to continue receiving HBSS program benefits while they reside at the SFS homes and, in turn, failing to provide proper notice and/or a hearing to challenge the denial, defendants have deprived plaintiffs of a protected liberty interest without due process. Indeed, such an appeal is mandated by the HBSS program. *See* 405 ILCS 80/2-8.

140.    The harm to plaintiffs is the result of defendants' intentional conduct and/or deliberate indifference to the rights of plaintiffs, which are secured by the U.S. Constitution.

141.    In deciding to cease providing plaintiffs with HBSS program benefits, defendants have, at all times, acted or refused to act under color of state law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs, granting the following relief:

A.    A judgment in favor of plaintiffs and against defendant James T. Dimas, the duly appointed Secretary of IDHS, and defendant Gregory Fenton, the Director of the Division of Developmental Disabilities of IDHS, who are both sued in their official capacity, on plaintiffs' claims for violation of the ADA, violation of the Rehabilitation Act, violation of the Medicaid Act (and in turn, the Social Security Act), and violation of the Due Process Clause;

B.    A declaratory judgment that the defendants violate the ADA, the Rehabilitation Act, the Medicaid Act (and in turn, the Social Security Act), and the Due Process Clause by terminating plaintiffs' HBSS program benefits while plaintiffs reside in the SFS homes and/or failing to provide the opportunity for a fair hearing or an appeal of such termination decision, and that the SFS homes satisfy the residency requirements

32

of the HBSS program, entitling plaintiffs to receive HBSS program benefits as residents of the SFS homes;

C.    A preliminary and permanent injunction:

    1)  restraining and enjoining defendants, IDHS, or IDHS's Division of Developmental Disabilities, or any other person or entity acting on their behalf or in privity, concert, or participation with them, from the threatened or actual denial or withholding of HBSS program benefits, services, or funds as a result of plaintiffs' residency in one of the SFS homes;

    2)  restraining and enjoining defendants, IDHS, or IDHS's Division of Developmental Disabilities, or any other person or entity acting on their behalf or in privity, concert, or participation with them, from relying on and implementing factors not expressly delineated or set forth in the HBSS law in determining whether an individual's residency meets the HBSS program's residency requirements;

    3)  requiring defendants, IDHS, or IDHS's Division of Developmental Disabilities, or any other person or entity acting on their behalf or in privity, concert, or participation with them, to provide notice and an opportunity to appeal any IDHS determination, for any reason, that an individual's residence does not satisfy the eligibility requirements of the HBSS program;

    4)  requiring defendants, IDHS, or IDHS's Division of Developmental Disabilities, or any other person or entity acting on their behalf or in privity, concert, or participation with them, to provide HBSS program waiver benefits to plaintiffs; and

5) directing defendants to file with this Court and to serve upon plaintiff's counsel at the address identified below within thirty (30) days after entry of an injunction, a report in writing and under oath setting forth in detail the manner and form in which defendants have complied with the injunction;

D.  An award of attorney's fees and costs and other expenses, including any available pre-judgment or post-judgment interest, that plaintiffs have been forced to incur, under 29 U.S.C. § 794a, 42 U.S.C. § 1988, 42 U.S.C. § 12133, or any applicable law; and

E.  Such other and further relief as this Court may deem just and proper.

DATED: September 19, 2016

/s/ *James P. Looby*

Charles C. Jackson
James P. Looby
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, Illinois  60601
312.324.1000 (phone)
312.324.1001 (fax)
charles.jackson@morganlewis.com
james.looby@morganlewis.com

ATTORNEYS FOR PLAINTIFFS